In re Nick **MIRANDA** and Barbara **Miranda**, Debtors.

Thomas J. **DURBIN**, Plaintiff,

v.

Nick **MIRANDA**, Defendant.

Bankruptcy No. 90–02217–293.
Adv. No. 90–0280.

United States Bankruptcy Court,
E.D. Missouri,
Eastern Division.

July 21, 1994.

Timothy H. Battern, St. Louis, MO, for debtors.

Stephen C. Hiotis, Clayton, MO, for plaintiff.

### MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

### JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(I), which the Court may hear and determine.

### PROCEDURAL BACKGROUND

1. Nick and Barbara Miranda filed a joint petition under Chapter 7 of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*).

2. Plaintiff Thomas J. Durbin filed a Complaint under Section 523(a)(2) against the Debtors alleging that a $38,000.00 debt the Mirandas owed him was not dischargeable in bankruptcy.

3. Barbara Miranda filed a Motion To Have Name Withdrawn From Suit Of Plaintiff Filed Under Section 523(A)(2) (sic). Mr. Durbin did not oppose Mrs. Miranda's Motion and the Court entered an Order dismissing Mrs. Miranda from this suit.

4. The Court held a trial on Mr. Durbin's Complaint.

### FACTUAL BACKGROUND

After considering the testimony adduced at trial and the record in this case, the Court makes the following findings:

1. From approximately 1979 through 1985, Debtor Nick Miranda operated a specialty used car business in which he located and imported European, primarily English, automobiles for sale to buyers in the United States. In the course of his business, Mr. Miranda used different automobile brokers

throughout Europe to help him locate automobiles. One broker with whom Miranda had dealt, Tony Bunker, told Miranda that he would sell him a 1970 Mercedes 600 Pullman limousine (limo) that had previously belonged to former-Beatle John Lennon. Mr. Bunker had purchased the limo from an English broker who had acquired it through a sale conducted by an auto-mechanic.

2. Nick Miranda purchased the limo from Mr. Bunker on December 4, 1984 intending to resell it at a profit after publicizing the fact that John Lennon had once owned it.[1] Miranda testified that he paid one-third of the amount owed to Mr. Bunker with money he borrowed from a man named Edward Murphy, that Murphy paid another third of the purchase price and that Mr. Bunker had, initially, retained a one-third interest in the limo. Miranda further testified that, within a week of the sale, he purchased Mr. Bunker's interest in the vehicle. As consideration for Mr. Bunker's third of the limo, Mr. Miranda granted Bunker a security interest in another automobile he owned and promised to give him either 5% or 10% of the profit he earned on his share (now ⅔) of the limo upon the vehicle's resale. At the hearing on this matter, Debtor stated that Mr. Murphy, having paid one third of the cost of the vehicle, held a one-third ownership interest in the limo.[2] Mr. Miranda testified that Mr. Murphy wished to remain a "silent partner" in the ownership and sale of the limo.[3]

3. Before December of 1984, Plaintiff, Thomas J. Durbin, purchased a car from Mr. Miranda. In late 1984 or early 1985, Mr. Durbin went to Mr. Miranda's office. The two men spoke and in the course of their conversation Mr. Miranda mentioned his investment in the limo. Miranda told Durbin that he owned the limo but failed to tell him either that Mr. Murphy had an ownership interest in the vehicle or that he had pledged a portion of his profit to Mr. Bunker. Mr. Durbin decided to invest in the venture and had his attorney draft an agreement (Agreement).

4. On February 12, 1985, Mr. Durbin and Mr. Miranda executed the Agreement under which Mr. Durbin agreed to pay $35,000.00 to Mr. Miranda in exchange for an interest in the limo. When he executed the Agreement, Mr. Durbin had no knowledge of either Mr. Murphy's interest in the limo or Mr. Miranda's pledge of profits to Mr. Bunker. The Agreement states that "Mr. Miranda currently owns or has a contract to buy [the limo] ... WHEREAS Miranda is willing to sell and Durbin is willing to purchase an undivided interest in and to the Vehicle [the limo]." The Agreement continues "1. Miranda hereby grants, conveys, sells and assigns to Durbin an undivided interest in and to the Vehicle so that both Miranda and Durbin will be owners of the Vehicle." The Agreement further delineated Mr. Durbin's interest in the venture as follows:

6. If the sale of the Vehicle does not take place by February 10, 1986, then Durbin shall have the unfettered right, at his sole discretion, at any time thereafter to tender back Durbin's undivided interest in the Vehicle for a fixed price of Forty-Two Thousand, Five Hundred ($42,500.00) Dollars. Miranda agrees to immediately pay this $42,500.00 without the right of any set off, to Durbin immediately upon Durbin's tender of his undivided interest in the Vehicle and the $42,500.00 shall be paid in readliy available funds, U.S. Dollars.

5. Mr. Miranda arranged to have the limo transported to Missouri where he titled it in his name. Miranda asked Durbin for $3,000.00 to pay for insurance for the limo. Mr. Durbin gave Mr. Miranda $3,000.00 for

---

1. Debtor testified that he purchased the limo for $81,000.00 but, in answer to one of many interrogatories filed with the Court, stated that he purchased the vehicle for $54,000.00.

2. Just as Mr. Miranda had stated different purchase prices for the limo in his testimony and in his answer to Plaintiff's interrogatory, so did the amount Mr. Murphy contributed to the venture differ. In his testimony before the Court, Miranda stated that Mr. Murphy had contributed $27,000.00 to the venture, $9,000.00 more than the $18,000.00 figure he had indicated Mr. Murphy had contributed to the venture in response to one of Plaintiff's interrogatories.

3. Mr. Miranda also testified that, unbeknownst to him until after September of 1985, Mr. Murphy was using his investment in the limo to launder money. Miranda later concluded that this was the reason that Murphy had requested that his participation in the venture be kept confidential.

the purpose of insuring the limo. Miranda publicized the fact that John Lennon had owned the limo, purchased "vanity" plates for the car that spelled "Lennon" and flew the car back to England so that it could be auctioned at Southby's in London. Mr. Miranda, in an attempt to generate publicity for the limo's auction, called a press conference at the airport when the limo arrived from Missouri. A picture of the limo appeared in an English newspaper. An attorney who represented Mary Wilson, formerly a member of the Supremes, saw a picture of the limo, recognized it as her property and had the vehicle impounded. Ms. Wilson filed a suit to determine title to the limo. After a lengthy legal battle, an English court found that the car belonged to Ms. Wilson.[4]

6. The parties did not indicate whether Mr. Durbin had invoked his right, under paragraph 6 of the Agreement, to demand payment of $42,500.00 from Mr. Miranda as payment for his interest in the limo. Mr. Durbin ultimately, though prior to the filing of the Mirandas' bankruptcy petition, filed suit against Mr. Miranda in the Circuit Court of the County of Saint Louis, State of Missouri.[5] Mr. Steven Hiotis represented Durbin in that state court litigation.

7. Mr. Hiotis was associated with the law firm of Ziercher & Hocker from January of 1988 until September 4, 1988. In September of 1988, Mr. Hiotis joined the law firm of Copeland, Gartner & Thompson. In the footnote of a letter dated December 13, 1988, Mr. Hiotis informed Mr. Theodore Schwartz, who represented Mr. Miranda in the state court suit, that he had left Ziercher & Hocker. That same footnote directed Mr. Schwartz's attention to the address and phone number of Mr. Hiotis's new law firm. Mr. Schwartz filed an Offer of Judgement

with the state circuit court. A Proof of Service, attached to the Offer of Judgement, indicates that, on May 26, 1989, a copy of the offer of judgement was mailed to Mr. Hiotis at the Copeland, Gartner & Thompson law firm's address. Also, Mr. Hiotis sent a letter to Mr. Schwartz under Copeland, Gartner and Thompson's letterhead, dated August 29, 1989, regarding the state court law suit between Mr. Miranda and Mr. Durbin.

8. Mr. Thomas J. Durbin, the Plaintiff in this adversary proceeding, has a claim against the Mirandas' bankruptcy estate. Mr. Durbin's proper name is Thomas J. Durbin, not J.J. Durbin. Mr. Durbin's home address during the time period spanning 1988 through 1990 was 307 Park Road, Webster Groves, Missouri.

9. On April 26, 1988, Nick Miranda sent a facsimile message to Mr. Durbin proposing an amendment of the Agreement between the parties. The facsimile listed Mr. Durbin's address as 307 Park Road, Webster Groves, Missouri.

10. Throughout 1990, Mr. Durbin's home address was listed in the St. Louis area telephone directory.

11. On May 5, 1990, Nick and Barbara Miranda filed a joint, voluntary petition seeking the protection of the Bankruptcy Code. The Mirandas also filed a schedule A-3 with the Court[6] listing the names of their unsecured creditors, those creditors' addresses and the amount the Mirandas owed to each creditor. In compiling their schedules and mailing matix, the Mirandas' relied upon their memories and various receipts for debts they owed. Among the entries on the Mirandas' schedule A-3 is the following:

J.J. Durbin

c/o Ziercher & Hocker

4. Apparently, Ms. Wilson had left the limo at a garage to be repaired. The mechanic who had repaired the limo, after unsuccessfully seeking payment for his services from Ms. Wilson, sold the vehicle to a broker. However, the mechanic had not provided Ms. Wilson with proper notice of his intent to sell the car which tainted the sale and led the English court to find that Ms. Wilson owned the limo.

5. Both parties referred to a case between the parties during the hearing before this Court.

Though the parties implied that the state court suit grew out of the parties' investment in the limo, neither party specified the theory on which Mr. Durbin based that litigation.

6. The Debtors filed a set of schedules, including Schedule A-3, with the Court when they filed their Voluntary Petition on May 9, 1990. The same entry appears on the Debtors' amended Schedule A-3 filed with the Court on June 19, 1990.

Attorneys at Law

130 So. Bemiston

Clayton, MO 63105

lawsuit filed 3/31/88

$42,500

Similarly, the mailing matrix the Mirandas filed with the Court included a creditor named J.J. Durbin with the mailing address:

c/o Ziercher & Hocker

Attorneys at Law

130 So. Bemiston

Clayton, MO 63105.

12. In a letter dated August 31, 1990, Mr. Schwartz informed Mr. Hiotis that Mr. Miranda had filed a petition in bankruptcy. Neither Mr. Hiotis nor Mr. Durbin had notice or actual knowledge of the Mirandas' bankruptcy before Mr. Hiotis received Mr. Schwartz's letter of August 31, 1990.

### DISCUSSION

The Court set August 13, 1990 as the deadline for parties to challenge the dischargeability of debts, under section 523 of the Code. Mr. Durbin did not file his adversary complaint challenging the dischargeability of the debt Mr. Miranda owed him until September 24, 1990, more than one month after the passing of the deadline the Court had imposed for the filing of such actions. Mr. Durbin maintained, at the February 7, 1991 hearing on this matter, that the Court should allow his action to proceed because he did not have notice of the Mirandas' bankruptcy until after the bar date for § 523 actions had passed. Application of the bar to his action, Mr. Durbin argued, would violate his right to due process.

At that same hearing, the Court ruled that application of the bar to Mr. Durbin's suit would violate his right to due process and held that it would retroactively extend the bar date from August 13, 1990 to September 27, 1990 and allow Mr. Durbin to challenge the dischargeability of the debt Mr. Miranda owed to him.

In reaching its holding, the Court found that Mr. Miranda had not listed Mr. Durbin as a creditor because the schedules and ma-

trix he and his wife filed with the Court listed a "J.J. Durbin", not the creditor, Thomas Durbin. The Court further found that the Debtors' attempts to give Mr. Durbin notice of the bankruptcy proceedings were deficient in that they had been sent, not to Mr. Durbin but to his attorney's former address. These misdirected mailings, the Court held, did not fulfill the Debtors' obligation to give notice of their bankruptcy to Mr. Durbin because Mr. Miranda had the means to send Mr. Durbin notice at an address where he could have been relatively certain that Mr. Durbin would have received it. For example, Mr. and Mrs. Miranda could have notified Mr. Durbin of their bankruptcy by mailing notice either to Mr. Durbin's home address [7], which was listed in the local telephone directory or to Mr. Hiotis's current business address which Mr. Schwartz, Mr. Miranda's attorney, knew. While the Court found that the Mirandas could have sent notice of their bankruptcy to Mr. Durbin at either his home address or at Mr. Hiotis's correct address, it did not find that the Debtors' mailing of notice to Mr. Durbin at Mr. Hiotis's out-dated address was done in bad faith.

Mr. Durbin's Complaint alleges that Mr. Miranda's failure to inform him that Mr. Murphy and Mr. Bunker held interests in the limo constituted fraud. Plaintiff Durbin maintains that he relied upon Mr. Miranda's misrepresentation and that he would not have invested in the venture if he had known that others owned the limo with Miranda because he would not have invested in such a venture with people whom he did not know.

In the Eighth Circuit, a creditor, to prevail under section 523(a)(2) of the Code, must establish:

(1) that the debtor made false representations;

(2) that at the time made, the debtor knew them to be false;

(3) that the representations were made with the intention and purpose of deceiving the creditor;

(4) that the creditor reasonably relied on the representations; and

---

**7.** Exhibit 2, the facsimile Mr. Miranda admitted-   ly typed, contained Mr. Durbin's home address.

(5) that the creditor sustained the alleged injury as a proximate result of the representations having been made.

*In re Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987). At the hearing on this matter, Mr. Miranda argued that his misrepresenting himself as the sole owner of the limo did not cause Mr. Durbin's loss. Instead, Miranda insisted that Mary Wilson's ownership of the limo, a fact of which he was ignorant in February of 1985, caused Miranda, Durbin and Murphy to lose their respective investments in the limo. In other words, Miranda argued that Durbin had not proven the fifth element of a 523(a)(2)(A) cause, namely that the misrepresentation proximately caused his loss.

The *Van Horne* court spoke to the issue of proximate causation. In that case, the debtor had persuaded his mother-in-law to refinance a loan to him without telling her that he intended to divorce her daughter. *Id.* at 1286. Shortly after his mother-in-law extended credit to him, Mr. Van Horne divorced his wife and, within four months, filed bankruptcy. *Id.* at 1286–87. The *Van Horne* debtor argued that his former mother-in-law's loss was caused by her initial extension of credit to him, years before he negotiated the refinancing, not by his misrepresentation of the status of his marriage with her daughter. 823 F.2d at 1289. The Eighth Circuit rejected Mr. Van Horne's argument saying that "[t]he proximate cause element of § 523 requires simply that the action of the debtor was the act, without which the claimant would not have suffered the loss complained of." *Id.* at 1288–89 (citing *In re Maier*, 38 B.R. 231, 233 (1984)). Here, Mr. Durbin testified that he would not have invested in the limo if he had known that people with whom he was unacquainted held ownership interests in the vehicle. Mr. Durbin explained that the existence of other investors would introduce the risk that one of those people could become involved in bankruptcy or divorce proceedings which might impair the venturers' ability to sell the limo. Mr. Miranda's concealment of Mr. Murphy's interest in the limo led Mr. Durbin to conclude that only he and Miranda would own the vehicle and assess the risks involved with that understanding. Hence, Miranda's fail-ure to disclose Murphy's involvement in the venture proximately caused Durbin's loss because he would not have invested in the venture if he had known that other individuals with whom he was unacquainted were involved.

■ Mr. Durbin has also established the existence of the other four elements he needs to prove to prevail under section 523(a)(2)(A). First, Miranda admitted that Mr. Murphy held an interest in the limo when he and Durbin entered into the Agreement. Mr. Durbin testified that he believed that only he and Miranda held ownership interests in the limo when they entered into the Agreement and pointed to the language in the Agreement saying that "Miranda . . . own[ed] or ha[d] a contract to buy [the limo]" and the sentence in the Agreement stating that Durbin and Miranda would "both . . . be owners" of the limo as evidence of this understanding. Mr. Miranda testified that he did not tell Mr. Durbin that no other people were involved in venture but that he had neglected to tell Durbin of Murphy's involvement; first, because Murphy had requested anonymity, second, because he did not think Murphy's ownership interest was significant, and third, because "it never came up." Even if the Court believes Mr. Miranda's assertion that he never stated that he and Durbin would be the only owners of the car, we find that Mr. Durbin has established the existence of the first element of a section 523 cause because, as the *Van Horne* court noted, "silence regarding a material fact can constitute a false representation actionable under section 523(a)(2)(A)." 823 F.2d at 1288 (citations omitted). The fact that Murphy owned an interest in the limo rendered Miranda's implications that he was the sole owner of it false. Similarly, Durbin has established that Miranda knew that he was not the sole owner of the limo when he entered into the Agreement with Durbin as demonstrated by Miranda's admission that he knew of Murphy's interest in the limo.

■ Third, Mr. Durbin had to prove that Mr. Miranda intended to deceive him when he concealed the existence of Mr. Murphy's interest in the limo. The *Van Horne* court

discussed the intent element of a section 523(a)(2)(A) cause and pointed out that "direct proof of intent (*i.e.* the debtor's state of mind) is nearly impossible to obtain" and that courts usually have to look to circumstances to infer whether the debtor possessed the requisite intent. *Id.* at 1287. Here, Mr. Miranda testified that he purposefully withheld information regarding Mr. Murphy's interest from Mr. Durbin because Mr. Murphy had asked to be a "silent partner" in the venture. Mr. Miranda, therefore, intentionally concealed the fact of Mr. Murphy's involvement in the venture from Mr. Durbin and in doing so, intentionally misled him. Finally, Mr. Durbin's reliance was reasonable, for he had no reason to think that Mr. Miranda did not own the limo or had not told him all the facts concerning the venture. Having found that Mr. Durbin proved the existence of all the elements of a 523(a)(2)(A) cause, the Court will refuse to discharge Mr. Miranda of the $38,000.00 debt he owes to Mr. Durbin.